FILED

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

04 MAR 22 AM 9: 12

MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

| | |
|---|---|
| DISNEY ENTERPRISES, INC., DC COMICS, HANNA-BARBERA PRODUCTIONS, INC., PLAYBOY ENTERPRISES INTERNATIONAL, INC., VIACOM INTERNATIONAL INC., and WARNER BROS. ENTERTAINMENT INC., | CIVIL NO.: 6:04-CV-386-ORL-18JGG FOR: |

(1)   COPYRIGHT INFRINGEMENT;

(2)   TRADEMARK INFRINGEMENT;

            Plaintiffs,

(3)   FALSE DESIGNATION OF ORIGIN AND FALSE DESCRIPTION;

vs.

KMR WHOLESALE, INC., SUNIL WARRIER, ASHA WARRIER, and JOHN DOES 1 - 5,

(4)   COMMON LAW UNFAIR COMPETITION;

**INJUNCTIVE RELIEF SOUGHT
FILED UNDER SEAL**

            Defendants.

_____

## COMPLAINT

Plaintiffs, Disney Enterprises, Inc., DC Comics, Hanna-Barbera Productions, Inc., Playboy Enterprises International, Inc., Viacom International Inc., and Warner Bros. Entertainment Inc., by and through its undersigned attorneys, allege for their Complaint as follows:

### INTRODUCTION

1.      Plaintiffs file this action against the Defendants, who have unlawfully engaged in the manufacture, duplication, distribution, sale, or offer for sale of counterfeit merchandise bearing exact copies or colorable duplications of Plaintiffs' trademarks, copyrights, or other exclusive properties.

2.     For violations of the Federal Statutes alleged in the Complaint, Plaintiffs seek a Temporary Restraining Order, Order of Seizure, Preliminary and Permanent Injunction, damages, costs, and attorneys' fees as authorized by the Lanham Act and Copyright Act.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1338(a) as the Plaintiffs' causes of action arise under The Copyright Act, 17 U.S.C. § 101 and The Federal Trademark Act ("Lanham Act"), 15 U.S.C. § 1051. Further, this Court has jurisdiction over the Plaintiffs' pendent and common law claims pursuant to 28 U.S.C. §§ 1338(b) and 1367.

4.     Venue is proper within this District pursuant to 28 U.S.C. § 1391(b) and § 1400(a).

## THE PARTIES

## PLAINTIFFS

5.     Plaintiff, Disney Enterprises, Inc., (hereinafter "Disney" or "Plaintiff") is a corporation duly organized and existing under the laws of the State of Delaware, having its principal place of business in Burbank, California.

A.     Disney, or one of various subsidiary companies wholly owned by Disney, is engaged is a variety of businesses, including the operation of the Walt Disney World resort complex and Disneyland park, producing and distributing motion pictures and television programs, operating stores and hotels, producing and selling books, records and tapes, and providing entertainment. A significant aspect of Disney's business is the merchandising and licensing of distinctive elements associated with its motion pictures and television programs including, but not limited to, the world-famous fanciful

characters Mickey Mouse, Minnie Mouse, Donald Duck, Daisy Duck, Goofy and Pluto, as well as characters from Disney animated motion pictures, including, but not limited to, "Pinocchio," "The Lion King," "Aladdin," "Beauty and the Beast," "The Little Mermaid," "Snow White and The Seven Dwarfs," "Pocahontas," "Hunchback of Notre Dame," "Hercules," "Mulan," "Toy Story," "The Emperors New Groove," and "Lilo and Stitch. Disney also jointly owns the copyrights to the feature movies "A Bug's Life," "Tarzan" and "Monsters, Inc." (hereinafter collectively referred to as "Disney Characters").

      B.    Each of the Disney Characters noted in subparagraph "A." above are covered by copyright registrations with the U.S. Copyright Office. Various copyright registrations are made in the name of Walter E. Disney. In October 1934, Walter E. Disney assigned his copyrights to Walt Disney Productions Ltd. ("WDPL"), and filed a copy of such assignment ("The Assignment") with the Copyright Office. In September 1938, WDPL and Walt Disney Enterprises ("WDE") and Liled Realty and Investment Company, Ltd., were consolidated into Walt Disney Enterprises. A copy of the consolidation agreement was filed with the Copyright Office. In December 1938, pursuant to an amendment to its articles of incorporation, Walt Disney Enterprises changed its name. A copy of the 1938 certificate of amendment of the articles of incorporation ("The 1938 Name Change") to Walt Disney Productions ("WDP") was filed with the Copyright Office. In February 1986, pursuant to an amendment to its articles of incorporation, WDP changed its name to The Walt Disney Company. A copy of the 1986 certificate of amendment ("The 1986 Name Change") was filed with the Copyright Office. On November 24, 1986 The Walt Disney Company, a California corporation

merged into The Walt Disney Company, a Delaware corporation.  In February 1996, pursuant to further amendment to its articles of incorporation, The Walt Disney Company, a Delaware corporation changed its name to Disney Enterprises, Inc.  A copy of the 1996 certificate of amendment ("The 1996 Name Change") was filed with the Copyright Office. Some, but not all of the applicable copyright registrations covering the characters and properties noted above in subparagraph "A." are indexed on Exhibit "A" and attached as aggregate Exhibit "B". Additionally, in those cases where Disney owns the copyright to the property jointly, the third party is indicated on the copyright registration attached as Exhibit "B."

C.   Disney also owns all rights, title, and interest in and to, and holds the exclusive rights to market and sell merchandise bearing the trademarks, trade names, service marks, artwork, characters and other distinctive elements for and related to the Disney Characters (hereinafter the "Disney Trademarks"). Disney adopted one or more of the Disney Trademarks for diverse articles and registered their trademarks with the United States Patent and Trademark Office. The Disney Trademarks are indexed on Exhibit "A" and attached as aggregate Exhibit "C."

6.  Plaintiff, DC COMICS (hereinafter "DC" or "Plaintiff" or "Plaintiffs), is a New York General Partnership consisting of E.C. Publications, Inc., a New York corporation, and Warner Communications, Inc., a Delaware corporation, , having its principal place of business in New York, New York.   Warner Bros. Consumer Products Inc., and Warner Bros. Pictures Inc. are subsidiaries of Warner Bros. Entertainment Inc., of which all are, affiliated companies of DC (hereinafter referred to as "Warner Bros.").

DC and its predecessors-in-interest is engaged in the business of publishing comic magazines and is among the most well-known and successful publishers of comic magazines in the world. It has created and published the highly successful and well-known characters "Batman," "Superman," "Swamp Thing," "Wonder Woman" and "The Flash." Of these, the most successful has been BATMAN. Created by the well-known comic artist, Bob Kane, BATMAN first appeared in the May 1939 issue of "Detective Comics." He was instantly popular and has since become one of the most successful and world-famous comic book super heroes. The related characters, "Robin," "The Riddler" and "Two Face," as well as other popular characters associated with Batman such as "Catwoman," "The Penguin" and "The Joker" were soon introduced to the public. (Batman and the related characters are hereinafter collectively referred to as the "Batman Characters").

    A.    The Batman Characters thereafter quickly appeared in other media than comic books. Columbia Pictures released two movie serials, "Batman" in 1943 and "Batman and Robin" in 1948. Two newspaper comic strips, one from 1943 through the 1950's and another from 1966 through 1972, together with frequent guest appearances in the 1940's "Superman" radio show, expanded the popularity of the Batman Characters beyond the comic book medium and market. An animated "Batman" Saturday morning television series ran during the 1968-1969 season. Another animated "Batman" show aired from 1977 through 1980 television seasons, and Batman appeared on two life-action specials aired in 1978, as well as the "Super Friends" animated Saturday morning television show from 1973 through 1988. The most recent "Batman" animated series debuted on the

Fox television network on September 5, 1992. In addition, in 1993, pursuant to a license from DC, Warner Bros. produced and distributed throughout the United States the animated feature motion picture, "Batman Mask Of The Phantasm," which received worldwide release shortly thereafter for home video.

    B.   In 1966, the ABC television network introduced the "Batman" live-action television series starring Adam West as Batman. The show ran for three seasons with a total of 120 episodes, and featured virtually all associated characters popularized in the original comic books, including Robin and The Riddler. Concurrently with the television series, a motion picture for theatrical exhibitions was produced. The series and motion picture have since been in continuous television syndication in the United States and abroad from 1966 through the present.

    C.   The Batman Characters have also achieved international publishing success. They have been published in approximately 20 languages in approximately 45 throughout the world. The Batman Characters are published in almost every comic book format, including periodicals, magazine serializations, albums, trade paperbacks and pocketbooks.

    D.   In 1989, pursuant to a license from DC, Warner Bros. produced and distributed throughout the United States and the world the feature motion picture "Batman" (the "1989 Film"). Warner Bros. is and has been for over 75 years one of the largest and most well-known producers and distributors of feature films in the world. Starring Michael Keaton as Batman, the 1989 Film was one of the most popular films of the year. "Batman" proved to be among the most successful licensing and

merchandising ventures of all time, with gross retail sales of associated licensed merchandise exceeding $1,000,000,000.

E.   In 1992, pursuant to a license from DC, Warner Bros. produced and distributed throughout the United States and the world the feature motion picture "Batman Returns," (the 1992 Film") again starring Michael Keaton as Batman, and featuring Michelle Pfeiffer as Catwoman and Danny De Vito as The Penguin.  Like the 1989 Film, "Batman Returns" was one of the most popular films of the year.  "Batman Returns" also proved to be a successful licensing and merchandising venture.

F.   In 1995, Warner Bros. completed production of "Batman Forever," staring Val Kilmer as Batman, and featuring Tommy Lee Jones as Two Face and Jim Carey as The Riddler.  "Batman Forever" was released nationwide on June 16, 1995, and was also extremely popular and successful.

H.   As the creator of the Batman Characters, at all times relevant hereto, DC has been and is still the holder of the exclusive right to reproduce, distribute, and/or license the reproduction and distribution of merchandise bearing or associated with the Batman Characters; and is the exclusive holder of all copyright, trademark, trade name and service mark rights in all artwork, characters and distinctive phrases and other creative elements which are incorporated in or associated with the Batman Characters.  A significant aspect of DC's business, and resulting revenues, has been for many years and continues to be the merchandising and licensing of distinctive elements associated with the Batman Characters.

I.   DC has granted and transferred to its affiliate company, Warner Bros., the right to supervise in the United States the merchandising

and licensing of the copyrighted elements, trademarks, trade names and service marks incorporated in or associated the Batman Characters. To date, DC has entered into licensing agreements with over 130 licensees in the United States. These agreements provide for the authorized use of the Batman Characters on products and in connection with services ranging from t-shirts and numerous items of children's and adult apparel through a vast array of products including, among others, toys and games, candy and food products.

J.     DC owns all right, title and interest in and to, and holds the exclusive rights to market and sell merchandise bearing, the trademarks, trade names, service marks, artwork, characters and other distinctive elements for and incorporating the Batman Characters (hereinafter the "Batman Trademarks"). DC adopted one or more of the Batman Trademarks for diverse articles and caused said trademarks to be registered in the United States Patent and Trademark Office. Photocopies of the Batman Trademarks are indexed as a part of Exhibit "A" and attached as a part of aggregate Exhibit "C."

7.     Plaintiff, HANNA-BARBERA PRODUCTIONS, INC. (hereinafter "Hanna-Barbera" or "Plaintiff" or "Plaintiffs), is a corporation, duly organized and existing under the laws of Delaware and having its principal place of business at Sherman Oaks, California.

A.     Hanna-Barbera is engaged in the business of creating and producing animated programs for television, home video and theatrical release. One television program created and produced by Hanna-Barbera is the television show *Scooby-Doo*. A significant source of additional revenue for

Hanna-Barbera's business is the merchandising and licensing of distinctive elements associated with its television programs, including *Scooby-Doo!* (including the characters Scooby-Doo, Shaggy, Fred, Velma, Daphne and The Mystery Machine). Hanna-Barbera created the show *Scooby-Doo* in 1969 in response to a request by the CBS television network for a new animated television series.  The series involves four teenage detectives who, with their Great Dane named Scooby-Doo, roam the country solving mysteries.  Scooby-Doo aired on the CBS television network from 1969 through 1976 and, in 1976, the television show moved to the ABC television network where it aired for a number of years in its original format and in a new two-hour format entitled *Scooby's All-Star Laff-a-lympics*.  *Scooby-Doo* holds the record for the longest running, continuously produced children's cartoon.  The show continues to be broadcast in syndication worldwide and it is one of the television shows featured on The Cartoon Network.  In 2001 Warner Bros. distributed a feature length film entitled "Scooby-Doo: The Movie"  which achieved wide distribution and grossed millions of dollars in United States theatrical revenues alone.  "Scooby-Doo" has since been released on home video formats, including home video and DVD as a result of which additional sales have been generated.  The revenue from products using the Hanna-Barbera Characters sold in the United States is substantial.  The appearance and other features of the Hanna-Barbera Characters are inherently distinctive and serve to identify Hanna-Barbera as the source of products bearing the Hanna-Barbera Characters.

B.  Hanna-Barbera is the owner of world famous registered marks which serve to distinguish Hanna-Barbera products.  Among these marks is

9

the "Scooby-Doo" mark.  Each year HANNA-BARBERA spends millions of dollars to develop and maintain the considerable good will it enjoys in its trademarks and in its reputation for high quality.  A representative list of trademark registrations for the "Scooby-Doo" mark is indexed as a part of Exhibit "A" and attached as a part of Exhibit "C" (collectively the "Hanna Barbera Trademarks").  The Hanna Barbera Trademarks are all valid, extant and in full force and effect.  The Hanna Barbera Trademarks are all exclusively owned by Hanna-Barbera. Hanna-Barbera has continuously used each of the Hanna Barbera Trademarks from the registration date, or earlier, until the present and at all times relevant to the claims alleged in this Complaint.  As a result of advertising and sales, together with longstanding consumer acceptance, the Hanna Barbera Trademarks identify Hanna-Barbera's products and authorized sales of these products.  The Hanna Barbera Trademarks have each acquired secondary meaning in the minds of consumers throughout the United States and the world. Hanna-Barbera, through its exclusive licensing agent, Warner Bros. has authorized and licensed the manufacture and sale of various different types of product bearing Hanna Barbera Properties.

8.    Plaintiff, Playboy Enterprises International, Inc. (hereinafter "PEII" or "Plaintiff" or "Plaintiffs") is a corporation duly organized and existing under the laws of the State of Delaware, having its principal place of business at 680 North Lake Shore Drive, Chicago, Illinois 60611.

A.    PEII produces, among other things, *Playboy*, the world's best-selling men's magazine. Almost 10 million American adults read *Playboy* every month, and the magazine's global readership is almost 15 million.

10

Capitalizing on the company's powerful brand name and its Rabbit Head logo, one of the most recognized trademarks in the world, *Playboy* is the only magazine to become a major international consumer brand. Playboy licenses its trademark for worldwide manufacture, sale, and distribution of a variety of consumer products. More than 1500 Playboy-branded products are sold in more than 125 countries and territories with global retail sales of approximately $350 million reported in 2003.

B.     The "Playboy" and Rabbit Head logo are the subject of numerous Federal and state registrations, as well as registrations in many other countries.  Representative samples of some of Playboy's Federal registrations are indexed on Exhibit "A" and attached as aggregate Exhibit "C".

9.     Plaintiff, Viacom International Inc. (hereinafter "Viacom" or "Plaintiff" or "Plaintiffs'), is a corporation duly organized and existing under the laws of the State of Delaware, having its principal place of business at 1515 Broadway, New York, New York 10036. MTV Networks is a division of Viacom.

A.     MTV Networks operates the famous Nickelodeon children's television channel and is engaged in a variety of businesses related to entertainment including television programming and the licensing of its properties. Such properties include "Dora the Explorer", "SpongeBob Squarepants", "Blue's Clues", "The Wild Thornberrys", "Rugrats", and "Jimmy Neutron Boy Genius".

B.     SPONGEBOB SQUAREPANTS (hereinafter the "SpongeBob Squarepants Character") is registered with the copyright office.  Sample copyright registrations covering the SpongeBob Squarepants Character are

indexed, as Exhibit A and attached as aggregate Exhibit "B". Viacom owns multiple trademark registrations for the mark SPONGEBOB SQUAREPANTS for a wide variety of goods and services. Sample registrations are indexed as Exhibit A and attached as aggregate Exhibit "C". Images of the SPONGEBOB SQUAREPANTS character function as a trademark which the public associates exclusively with the products and services manufactured, sponsored and/or endorsed by Viacom.

10.    Plaintiff, Warner Bros. Entertainment Inc. (hereinafter "WBEI" or "Plaintiff" or "Plaintiffs"), is a corporation organized and existing under the laws of the State of Delaware, U.S.A., which maintains its principal place of business in Burbank, California.

A.    WBEI is and has been for over 75 years one of the largest and most well-known producers and distributors of feature films in the world. Today, motion pictures are distributed by WBEI through Warner Bros. Pictures Inc., a subsidiary of WBEI. Other subsidiaries of WBEI include Warner Bros. Television Production Inc. and Warner Bros. Consumer Products Inc.

B.    WBEI and its predecessors-in-interest have been for many years been one of the largest and most well-known producers and distributors of cartoons in the world. All copyrights and trademarks previously owned by Time Warner Entertainment Company, L.P. have passed by assignment from Time Warner Entertainment Company, L.P. to Warner Communications and then to WBEI.

C.    Since 1929, WBEI has produced and distributed hundreds of animated cartoons. Among WBEI's cartoons are the classic, internationally famous cartoons produced and distributed under the registered trademark

12

LOONEY TUNES and featuring the LOONEY TUNES cartoon characters (hereinafter referred to as the "LOONEY TUNES Characters"). The LOONEY TUNES Characters include TWEETY, WILE E. COYOTE, ROAD RUNNER, PORKY PIG, BUGS BUNNY, TASMANIAN DEVIL, and DAFFY DUCK, among others.

D.   The LOONEY TUNES Characters have appeared in over 100 copyrighted cartoons, television specials, and animated motion pictures produced and distributed by WBEI. These characters have symbolized Warner for over 50 years. WBEI is the owner of the LOONEY TUNES Characters and of all of the intellectual property rights associated therewith.

E.   WBEI owns all rights, title and interest in and to, and holds exclusive rights to market and sell, merchandise bearing the trademarks, trade names, service marks, artwork, characters and other distinctive elements for and incorporating the LOONEY TUNES Characters (hereinafter referred to as the "LOONEY TUNES Trademarks"). WBEI adopted one or more of LOONEY TUNES Trademarks for diverse articles and caused said trademarks to be registered in the United States Patent and Trademark Office. Copies of some, by no means all of these registrations are indexed as part of Exhibit "A" and attached aggregately as Exhibit "C."

F.   A significant portion of WBEI's business has been the creation and commercial exploitation of the LOONEY TUNES Characters in connection with the sale of merchandising products, including toys and novelty items, through licensees. WBEI has created, developed and promoted its original LOONEY TUNES Characters used on merchandising products through the expenditure of extraordinary efforts and millions of dollars.

13

WBEI receives substantial licensing revenues from the sale of the merchandising products.

## DEFENDANTS

11.    Defendant, KMR Wholesale, Inc. (hereinafter "KMR" or "Defendants"), is a corporation duly organized and existing under the laws of the State of Florida, having its principal place of business at 6965 Hanging Moss Road, Orlando, Florida 32807, and which is also doing business at the Webster Flea Market, located at 516 N.W. 3rd, Webster Florida.

12.    Defendant, Sunil Warrier (hereinafter "S. Warrier" or "Defendants") is, upon information and belief, an officer of KMR who is doing business in the State of Florida and this district at 6965 Hanging Moss Road, Orlando, Florida 32807, and also doing business at the Webster Flea Market, located at 516 N.W. 3rd, Webster  Florida, and who is the controlling force and director of KMR.

13.    Defendant, Asha Warrier (hereinafter "A. Warrier" or "Defendants") is, upon information and belief, an officer of KMR who is doing business in the State of Florida and this district at 6965 Hanging Moss Road, Orlando, Florida 32807, and also doing business at the Webster Flea Market, located at 516 N.W. 3rd, Webster  Florida, and who is the controlling force and director of KMR.

14.    Defendants John Doe 1 though 5 (hereinafter "John Doe" or "Defendant" or "Defendants"), are Defendants whose names are not at this time known, but upon information and belief, reside in the Middle District of Florida, and who actively participated in, or assisted in, the infringement of the above-named Plaintiffs' trademarked and copyrighted properties through the unauthorized manufacture, copying, duplication, distribution, display,

sale, or offer for sale of merchandise bearing the Plaintiff's trademarked and copyrighted properties, including, but not limited to, the trademarks and copyrights listed on Exhibit "A." Once these Defendants' true identity are known the Plaintiff will amend this lawsuit to add the JOHN DOE Defendant's true and correct names.

### FACTUAL BACKGROUND

15.    Each of the Plaintiffs have created or utilized the copyrighted works and distinctive trademarks indexed on Exhibit "A." Each of the distinctive trademarks signifies to the purchaser that the product originates exclusively with the Plaintiff trademark owner and is manufactured to the highest-quality standards. Additionally, each of the copyrighted properties have become so popular that each of the Plaintiffs owning copyrighted properties have at one time or another licensed them in conjunction with a wide variety of goods and services. Whether the Plaintiffs manufacture the product themselves or license others to do it, each of the named Plaintiffs has insured that products bearing its trademarks or licensed trademarks are manufactured to the highest standard.

16.    The enormous popularity of Plaintiffs' products is not without costs, as evidenced by the increasing numbers of counterfeiters in the United States and worldwide.

17.    Each of the Defendants named in this Complaint has been and threatens to continue to import, distribute, offer for sale and sell counterfeit merchandise consisting of mobile phone face plates created through the application of counterfeit decals, as well as related merchandise, bearing exact copies, or colorable imitations of the Plaintiffs' distinctive trademarks,

licensed trademarks, and copyrighted works.  See aggregate Exhibit "E." None of the Defendants have ever been authorized by the Plaintiffs at any time to reproduce, manufacture, import, copy or sell any mobile phone face plates bearing decals, or any related merchandise bearing the Plaintiffs' trademarks, licensed trademarks and copyrights (hereinafter referred to as the "Infringing Merchandise").  See aggregate Exhibit "D."

## COUNT I - COPYRIGHT INFRINGEMENT (17 U.S.C. § 101)

18.     Plaintiffs Disney and Viacom bring the following claim of copyright infringement against the Defendants and incorporates by reference allegations 1 through 17 above. For the purpose of Count I, the Plaintiffs listed in this paragraph shall be referred to as the "Copyright Plaintiffs".

19.     Defendants have manufactured, distributed, sold, or offered for sale Infringing Merchandise bearing the copyrighted properties of the Copyright Plaintiffs. A list of some, but not all, of said copyrighted properties infringed upon appears in Exhibit "A."

20.     Defendants have never been authorized by the Copyright Plaintiffs to distribute the Copyright Plaintiffs' copyrighted properties; nor have the Copyright Plaintiffs ever authorized, licensed, or in any manner allowed the Defendants the right to import, manufacture, distribute, sell, or offer for sale any merchandise including, but not limited to, the Infringing Merchandise which bear any of said copyrighted properties.

21.     Defendants have imported, manufactured, distributed, sold, or offered for sale Infringing Merchandise which incorporate the Copyright Plaintiffs' copyrighted properties, in direct violation of the Copyright Plaintiffs' copyrights.

22.   Each Defendant, individually or in conspiracy with the other named Defendants, has imported, manufactured, distributed, sold, or offered for sale Infringing Merchandise bearing the Copyright Plaintiffs' copyrighted properties. Defendants' committed their acts with actual as well as constructive knowledge of the Copyright Plaintiffs' exclusive rights, and their actions have contributed to the infringing, copying, duplication, sale, and offer for sale of counterfeit copies of the Copyright Plaintiffs' copyrighted properties.

23.   Each of the acts by each Defendant, which infringes one of the Copyright Plaintiffs' copyrights, is the basis for a separate claim against each Defendant under the Copyright Act.  For the sake of brevity, each and every allegation set forth which is pertinent to each separate claim by the Copyright Plaintiffs against each Defendant is repeated as to each such claim with the same force and effect as if such claim and the pertinent allegation had been set forth separately and in full.

24.   Upon information and belief, Defendants' acts as alleged are willful infringements of and have irreparably harmed the Copyright Plaintiffs' copyrights and exclusive rights, and threaten further infringements and further irreparable harm to Copyright Plaintiffs' copyrights and exclusive rights. Further harm and injury to Copyright Plaintiffs is imminent, and the Copyright Plaintiffs are without an adequate remedy at law with respect to such harm and injury.  Unless Defendants' acts are enjoined and the illicit counterfeiters of the Copyright Plaintiffs' copyrighted properties are stopped, it is highly probable that one or more of the Defendants, or others under their direction, will manufacture, distribute, sell, or offer for sale additional

Infringing Merchandise which bear the Copyright Plaintiffs' copyrighted properties causing further irreparable injury to Copyright Plaintiffs.

25.     Defendants have obtained gains, profit, and advantages as a result of his wrongful acts noted above.

26.     The Copyright Plaintiffs are entitled, at its option, to statutory damages as provided by 17.U.S.C. § 504 in lieu of actual damages and the Defendants' profits.

## COUNT II - TRADEMARK INFRINGEMENT AND TRADEMARK COUNTERFEITING

27.     Plaintiffs DC, Hanna-Barbera, PEII, and WBEI, incorporate by reference paragraphs 1 through 17 and 19 through 24, and bring the following claim for trademark infringement pursuant to 15 U.S.C. § 1114, against the Defendants.  For the purpose of Count II, the Plaintiffs listed in this paragraph shall be referred to as the "Trademark Plaintiffs".

28.     The Trademark Plaintiffs own or are licensees of the exclusive trademark rights to those trademarks indexed on Exhibit "A" and attached as Exhibit "C." All of the trademark registrations are in full force and effect and are owned by the Trademark Plaintiffs or Trademark Plaintiff's licensors. In many cases the trademarks have become incontestable pursuant to 15 U.S.C. § 1065.

29.     Trademark Plaintiffs, or those under their authority, manufacture and distribute all of their products and advertising in conformity with the provisions of the United States Trademark law.

30.     Notwithstanding the Trademark Plaintiffs' or their licensors' well-known and prior common law and statutory rights in their trademarks,

Defendants have adopted and used the trademarks in the State of Florida and interstate commerce. Defendants committed their acts with actual notice of the Trademark Plaintiffs' federal registration rights and long after the Trademark Plaintiffs or their licensors established their rights in the trademarks

31.     Defendants' committed their acts of infringement of Trademark Plaintiffs' or their licensors' registered trademarks in the Middle District of Florida, within the jurisdiction of this Court. Defendants imported, manufactured, distributed, sold, and offered for sale Infringing Merchandise bearing the Trademark Plaintiffs' trademarks without the authorization of the Trademark Plaintiffs and continue to offer for sale such products to the public. Defendants sold or offered for sale Infringing Merchandise bearing the Trademark Plaintiffs' trademarks in the Middle District of Florida and interstate commerce, thus creating the likelihood of confusion, deception, and mistake.

32.     Each Defendant, individually or in conspiracy with the other named Defendants, have imported, manufactured, distributed, sold, or offered for sale counterfeit or unauthorized Infringing Merchandise bearing the Trademark Plaintiffs' distinctive trademarks. Defendants' acts were done with actual and constructive knowledge of the Trademark Plaintiffs' exclusive rights, and have contributed to the infringing, copying, duplication, sale, and offer for sale of counterfeit copies of merchandise bearing the Trademark Plaintiffs' distinctive trademarks.

33.     Each of the acts, which infringe one of the Trademark Plaintiffs' separate trademarks, is the basis for a separate claim against each

Defendant under the Lanham Act. For the sake of brevity, each and every allegation set forth which is pertinent to each separate claim by each Trademark Plaintiff against each Defendant is repeated as to each such claim with the same force and effect as if such claim and the pertinent allegation had been set forth separately and in full.

34.   Defendants' acts of infringement will cause irreparable injury to the Trademark Plaintiffs if the Defendants are not restrained by the Court from further violation of the Trademark Plaintiffs' rights, as Trademark Plaintiffs have no adequate remedy at law.

35.   The Trademark Plaintiffs have suffered damages as a result of the Defendants' acts.

36.   Defendants' use in commerce of the Trademark Plaintiffs' trademarks in the sale of Infringing Merchandise is an infringement of the Trademark Plaintiffs' registered trademarks in violation of 15 U.S.C. § 1114(1) and is the basis for a temporary restraining order and seizure order pursuant to 15 U.S.C. § 1116(d).

37.   Upon information and belief, Defendants committed the alleged acts intentionally, fraudulently, maliciously, willfully, wantonly, and oppressively with the intent to injure the Trademark Plaintiffs and their businesses.

### COUNT III - FALSE DESIGNATION OF ORIGIN AND FALSE DESCRIPTION (15 U.S.C. § 1125)

38.   All Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 17, 19 through 24, and 28 through 34.

39.   The Plaintiffs' trademarks, licensed trademarks and copyrighted properties have acquired a secondary and distinctive meaning and the public has come to identify the marks shown on Exhibits "B" and "C" with their respective owner or licensors.

40.   The unauthorized manufacture of Infringing Merchandise, which have been distributed and sold by the Defendants, exactly duplicate and appropriate the likeness of the Plaintiffs' copyrighted, trademarks, and licensed trademarks in order to confuse and deceive the public into believing that the Infringing Merchandise have been authorized and/or sponsored by the Plaintiffs.

41.   The sale of Infringing Merchandise bearing the Plaintiffs' copyrighted properties, trademarks, and licensed trademarks will damage the goodwill and reputation of the Plaintiffs.

42.   The sale of Infringing Merchandise bearing the Plaintiffs' copyrighted properties and trademarks which are of an inferior quality to the authorized and authentic product will further damage the goodwill and reputation of the Plaintiffs.

43.   Defendants, by misappropriating and using the likenesses of the Plaintiffs' copyrighted properties, trademarks, and licensed trademarks, in connection with the sale of Infringing Merchandise, are misrepresenting and will continue to misrepresent and falsely describe to the general public the origin and sponsorship of their products. Defendants have caused such products to enter into interstate commerce with full knowledge of the falsity of the designation of their origin and description and representation in an

effort to mislead the purchasing public into believing that their products are authorized or emanate from the Plaintiffs.

44.    These acts constitute a violation of Section 43 of The Lanham Act, 15 U.S.C. § 1125.

45.    The continued use by the Defendants of the likenesses of the Plaintiffs' copyrighted properties, trademarks, and licensed trademarks has caused, and will continue to cause, serious irreparable injury and harm to the Plaintiffs, and the Plaintiffs' have no adequate remedy at law.

46.    Defendants have obtained gains, profits and advantages as a result of their unlawful acts.

47.    Plaintiffs have suffered monetary damages as a result of the Defendants' acts.

## COUNT IV-UNFAIR COMPETITION UNDER FLORIDA'S COMMON LAW

48.    Plaintiffs repeats and realleges paragraphs 1 through 17, 19 through 24, 28 through 34, and 39 through 44 of this Complaint.

49.    Plaintiffs have expended significant sums of money in advertising and marketing products featuring their trademarked and copyrighted properties, and in creating a consumer demand for such products and services in Florida and elsewhere in the United States. Consequently, these products and services have become widely known and accepted.

50.    The Defendants are utilizing the Plaintiffs' trademarked and copyrighted properties in conjunction with the advertising, marketing, and offering for sale of Infringing Merchandise, thereby passing it off as goods authorized or distributed by Plaintiffs.

51.   The Defendants have knowingly and willfully appropriated the Plaintiffs' trademarked and copyrighted properties in an effort to create the impression that the Defendants' Infringing Merchandise are sanctioned by the Plaintiffs, in order to misappropriate all of the goodwill associated with the Plaintiffs' trademarked and copyrighted properties.

52.   The Defendants' acts constitute unfair competition and, unless enjoined by this Court, will result in the destruction or dilution of the goodwill of Plaintiffs' valuable property rights to the unjust enrichment of the Defendants.

53.   The goods advertised, marketed and offered for sale by the Defendants in conjunction with the Plaintiffs' trademarked and copyrighted properties are calculated and likely to deceive and mislead the purchasers who buy them in the belief that they originate with or are authorized by the Plaintiffs.

54.   The Defendants' continued passing off of Infringing Merchandise as if such goods originated with or were authorized by the Plaintiffs has caused and, unless restrained, will continue to cause serious and irreparable injury to Plaintiffs.

55.   Plaintiffs have no adequate remedy at law and is suffering irreparable harm as a result of the aforesaid actions by the Defendants.

56.   Defendants committed the acts alleged herein intentionally, fraudulently, maliciously, willfully, wantonly, and oppressively with the intent to injure the Plaintiffs' and their businesses.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand interim relief in the form of a Temporary Restraining Order, Seizure Order, Order of Impounding and

Preliminary Injunction, and consistent with that, entry of a judgment against each and every Defendant as follows:

1.    Permanent injunctive relief restraining each Defendant, its officers, agents, servants, employees, and attorneys, and all those in active concert or participation with them, from:

a.    further infringing each of the Plaintiffs' copyrighted properties, trademarks, and licensed trademarks by manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, displaying, or otherwise disposing of any products not authorized by the Plaintiffs bearing any simulation, reproduction, counterfeit, copy, or colorable imitation of any of Plaintiffs' copyrighted properties and trademarks ("Unauthorized Products").

b.    using any simulation, reproduction, counterfeit, copy or colorable imitation of any of Plaintiffs' copyrighted properties, trademarks and licensed trademarks in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of Unauthorized Products in such fashion as to relate or connect, or tend to relate or connect, such products in any way to the Plaintiffs, or to any goods sold, manufactured, sponsored or approved by, or connected with, the Plaintiffs.

c.    making any statement or representation whatsoever, or using any false designation of origin or false description, or performing any act, which can or is likely to lead the trade or public, or individual members thereof, to believe that any products manufactured, distributed or sold by the Defendants are in any manner associated or connected with any of the

Plaintiffs, or are sold, manufactured, licensed, sponsored, approved or authorized by any of the Plaintiffs.

     d.   engaging in any other activity constituting unfair competition with any of the Plaintiffs, or constituting an infringement of any of the Plaintiffs' trademarks or of Plaintiffs' rights in, or to use or to exploit, said copyrighted properties and trademarks, or constituting any dilution of any of the Plaintiffs' names, reputations, or good will;

     e.   effecting assignments or transfers, forming new entities or association or utilizing any other device for the purpose of circumventing or otherwise avoiding the prohibitions set forth in Subparagraphs (a) through (d); and

     f.   secreting, destroying, altering, removing or otherwise dealing with the Unauthorized Products or any books or records which may contain any information relating to the importing, manufacturing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting or displaying of all unauthorized products which infringe any of Plaintiffs' trademarks or copyrights.

    2.   Directing that Defendants deliver for destruction all Unauthorized Products, including mobile telephone covers and related merchandise, and labels, signs, prints, packages, presses, dyes, wrappers, receptacles, silk screens, heat transfers, embroidery templates, software and advertisements relating thereto in their possession or under their control bearing any of the Plaintiffs' trademarks or any simulation, reproduction, counterfeit, copy or colorable imitations thereof, and all plates, molds, heat transfers, screens, matrices, software and other means of making the same.

3.    Directing that each Defendant report to this Court within 30 days after a Permanent Injunction is entered to show their compliance with paragraphs 1 and 2 above.

4.    Directing such other relief as the Court may deem appropriate to prevent the trade and public from gaining the erroneous impression that any products manufactured, sold or otherwise circulated or promoted by Defendants are authorized by the Plaintiffs, or related in any way to the Plaintiffs' products.

5.    That Trademark Plaintiffs be awarded from each Defendant selling products containing unauthorized trademarks belonging to such Trademark Plaintiff three times such Defendant's profits therefrom, after an accounting, pursuant to 15 U.S.C. § 1114 and § 1117, or at the election of Trademark Plaintiffs, statutory damages as provided by § 1117(c), of between Five Hundred Dollars ($500) and One Hundred Thousand Dollars ($100,000), per trademark per type of goods sold, which is counterfeited by each Defendant, at the Court's discretion, or should this Court find that the use of the Defendant's use of the counterfeit mark was willful, and in the Court's discretion, not more than One Million Dollars per counterfeit mark per type of goods sold by each Defendant.

6.    That each of the Plaintiffs be awarded from each Defendant selling products containing unauthorized trademarks belonging to such Plaintiff three times such Defendant's profits therefrom, after an accounting, pursuant to 15 U.S.C. § 1125(a) and § 1117.

7.    That all the Plaintiffs be awarded their reasonable attorney's fees and investigative fees pursuant to 15 U.S.C. § 1117 and 17 U.S.C. § 505.

8.    That the Copyright Plaintiffs, be awarded from each Defendant found to be in violation of their copyrighted properties, the Defendant's profits, or at Copyright Plaintiffs' election, an award of statutory damages pursuant to 15 U.S.C. § 504, of no less than Seven Hundred and Fifty Dollars ($750) nor more than Thirty Thousand Dollars ($30,000) per copyrighted property infringed upon by each Defendant, at the Court's discretion, or should this Court find that such infringement was willful, that this Court, pursuant to its discretion, award statutory damages of up One Hundred and Fifty Thousand Dollars ($150,000) for each copyrighted property infringed upon by each such Defendant.

9.    That all the Plaintiffs be awarded their costs in bringing this action.

10.   That all the Plaintiffs have such other and further relief that this Court deems just.

Dated this _22__ day of March, 2004.

Respectfully submitted,

Michael W.O. Holihan
Florida Bar No: 782165
**Michael W.O. Holihan, P.A.**
1101 North Lake Destiny Road
Suite 350
Maitland FL 32751
Telephone: (407) 660-8575
Facsimile: (407) 660-0510
Mobile: (407) 963-5885
Attorneys for Plaintiffs

# ADDITIONAL

# ATTACHMENTS

# <u>NOT</u>

# SCANNED

___X___ Exceeds scanner's page limit (Exhibits)
_____ Physical exhibit prevents scanning
___X___ Other:

# **REFER TO COURT FILE**